IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

TERRY SMITH,                          )
                                      )
                    Plaintiff,        )
                                      )  Case No. 18 C 1513
-vs-                                  )
                                      )  Chicago, Illinois
JENNIFER ROSATO PEREA, et al.,        )  September 14, 2018
                                      )  10:19 a.m.
                    Defendants.       )


   TRANSCRIPT OF PROCEEDINGS - PRELIMINARY INJUNCTION HEARING
            BEFORE THE HONORABLE ANDREA R. WOOD

APPEARANCES:

For the Plaintiff:      MR. FITZGERALD TIMOTHY BRAMWELL
                        The Law Offices of Fitzgerald Bramwell
                        225 West Washington
                        Suite 2200
                        Chicago, IL 60606
                        (312) 924-2884
                        Email: Bramwell@fitzgeraldbramwell.com

For the defendants:     MR. ERIC H. RUMBAUGH
                        Michael Best & Freidrich, LLP
                        100 East Wisconsin Avenue
                        Suite 3300
                        Milwaukee, WI 53202
                        (414)271-6560
                        Email: Ehrumbaugh@michaelbest.com




Court Reporter:

                KATHLEEN M. FENNELL, CSR, RPR, RMR, FCRR
                        Official Court Reporter
                    United States District Court
                219 South Dearborn Street, Suite 2524-A
                        Chicago, Illinois  60604
                    Telephone:  (312) 435-5569
                Kathleen_Fennell@ilnd.uscourts.gov

1    (Proceedings heard in open court:)

2        THE CLERK:  Calling case 18 CV 1513, Smith versus

3    Rosato.

4        MR. RUMBAUGH:  Eric Rumbaugh appearing for

5    defendants.

6        THE COURT:  Okay.  And for the plaintiff.

7        MR. BRAMWELL:  Good morning, Judge.  Jerry Bramwell

8    for Professor Smith.  B-R-A-M-W-E-L-L.

9        THE COURT:  Okay.  Good morning, counsel.

10        So before we jump into substance here, let's make

11    sure that we are clear on all the procedural issues.  First of

12    all, I've got two attorneys in front of me.

13        Are you the only attorneys that are appearing for

14    today's purposes?

15        MR. RUMBAUGH:  Yes for defendants, your Honor.

16        MR. BRAMWELL:  Yes.

17        THE COURT:  Okay.  And we had discussed previously

18    when we set this date that this would be a preliminary

19    injunction hearing based on the paper submissions supplemented

20    by oral argument.  I just want to confirm whether or not you

21    were intending to have any witnesses testify.

22        Anybody from the plaintiff's side?

23        MR. BRAMWELL:  We have no witnesses today, Judge.

24        THE COURT:  For the defense?

25        MR. RUMBAUGH:  Per the Court's instructions, your

1    Honor, no witnesses.

2         THE COURT:  If there's something you feel needs to be

3    fleshed out in the record in your client's defense, you can

4    make a request.

5         MR. RUMBAUGH:  It was our understanding that the

6    Court was going to do this as a -- on the record.

7         THE COURT:  Okay.

8         Now, it occurred to me, perhaps too late, that I

9    don't know that we had set firm time limits for today's

10   arguments, so I'd like to get a sense of what the parties had

11   in mind in your preparation.  We'll see if that's reasonable.

12        Have the parties discussed how much time you were

13   planning to spend?

14        MR. RUMBAUGH:  When we were here last, your Honor,

15   the Court set 20 minutes per side and 20 minutes for the Court

16   with one hour total.

17        MR. BRAMWELL:  That was my understanding, too, Judge,

18   but I'm prepared to stay here as long as you need, or if you

19   only have a few questions, I will keep my statements short.

20        THE COURT:  Okay.  So how I would expect and I'll

21   just say when I was indicating an hour total, anticipating

22   that I would probably have questions for the parties, which

23   I'm sure I will, probably the best way to allocate it is to do

24   what at least normally for oral argument on what you would do

25   in the appellate court is I'm going to formally allocate

1    30 minutes per side.

2         If my questioning causes it to go over that period of

3    time, you will not be penalized for that, but the 30 minutes

4    is designed to give you your 20 minutes of affirmative

10:22:38    5    argument, as well as to account for whatever time I take for

6    questioning.  If I don't have much questions -- much in the

7    way of questions, then you can, of course, fill out the end of

8    your time.  You won't be penalized in that way either.

9         And since the plaintiff has the burden here, I'll

10:22:59   10    also let you reserve some time if you would like, and if you

11    don't use all of your time --

12         MR. BRAMWELL:  I'd like to reserve ten minutes,

13    please.

14         THE COURT:  Okay.  And counsel may sit at the table

10:23:18   15    when each other is arguing.  You don't have to remain standing

16    at the podium if you do not like to or if you'd like to not

17    have to stand for a full hour.

18         I see that there are demonstratives that plaintiff is

19    planning to use.  Are all of your demonstratives sort of

10:23:37   20    poster board demonstratives?

21         MR. BRAMWELL:  Yes, Judge.  I only have two if they

22    are helpful to you.  Sometimes they are helpful to me to see

23    something, but if they're not helpful, I will put them away.

24         THE COURT:  You are free to use them if you would

10:23:52   25    like to use them.

1    Are you planning on using any of the electronic

2 equipment?

3    MR. BRAMWELL:  I don't even know how the electronic

4 equipment in this courtroom works.

10:24:02   5    THE COURT:  So that's a no.

6    Mr. Rumbaugh, were you planning on using the

7 electronic equipment?

8    MR. RUMBAUGH:  I was not, your Honor.

9    THE COURT:  Okay.  Good.

10:24:10  10    And then I have at the bench the filings made by the

11 parties, including the courtesy copies of all of the exhibits,

12 so if there are exhibits that you would like to reference from

13 your filings, I do have copies here with me.  You may refer to

14 them, please.

10:24:29  15    Try your best to refer to them as they're identified

16 in the filed record so that the transcript is clear as to what

17 you were referring to as we go.

18    And then finally before we get started, I don't know

19 if there are any concerns here about the confidentiality order

10:24:51  20 that's in place and anything that might be mentioned during

21 the oral argument that either side feels should not be

22 discussed in an open courtroom.

23    Are there any concerns along those lines?

24    MR. RUMBAUGH:  If -- for my part, your Honor, I

10:25:08  25 intend to not reference anything that the Court's sealed or

10:25:26

1    that's covered by the confidentiality order, and if it becomes

2    necessary, I would alert the Court and the Court could hear

3    sidebar or take the argument in chambers or whatever the Court

4    wanted to do, but I don't anticipate needing to refer to

5    something that's sealed.

6         If it comes up, I will alert the Court, and I'm sure

7    opposing counsel will do the same.

8         MR. BRAMWELL:  Judge, we actually do intend to

9    reference the Powers Report.  We intend to reference a couple

10:25:37

10   other documents that apparently were so sensitive even their

11   names were redacted.

12        I do know that there is a member of *The DePaulia*

13   here.  There is somebody in a lavender shirt who I met

14   briefly.  I believe he's affiliated with DePaul.  I don't know

10:25:53

15   what his role is otherwise.

16        Ultimately, we believe that all of this should be

17   public, as you know, so that's our position.

18        THE COURT:  Okay.  So the Powers Report and then you

19   said another document?

10:26:06

20        MR. BRAMWELL:  Yes.  Two other documents that we may

21   potentially reference.  The names were redacted, so I -- if I

22   can mention them, I will, but I don't -- I don't like even

23   coming close to violating court orders.

24        THE COURT:  I appreciate that.

10:26:24

25        So why don't we, in lieu of closing the courtroom,

1   why don't we have a quick sidebar, and this portion of the

2   transcript will be placed under seal just so I can determine

3   whether any special procedures need to be undertaken so that

4   the documents can be discussed in court, okay?  So we'll have

10:26:43   5   a sidebar off to the side.

6         (Sealed proceedings heard at sidebar:)







19    (Proceedings heard in open court:)

20         THE COURT:  Counsel, Mr. Rumbaugh, why don't we plan

21  on resuming at 10:40, so talk to your clients.  Mr. Bramwell

22  is going to take a break as well to use the facilities, so if

23  you'd like to do that as well after you talk to your client,

24  please do.  And then we'll resume and plan on going straight

25  into oral argument at about 10:40.

1    (Recess from 10:30 to 10:48 a.m.)

2         THE COURT:  Okay.  Mr. Rumbaugh, were you able to

3    talk to your clients?

4         MR. RUMBAUGH:  We're okay with what the Court

10:48:53  5    proposed, your Honor.

6         THE COURT:  Okay.  So the discussion we had at

7    sidebar relating to material that has been -- let me put it

8    this way -- material contained within documents that have been

9    designated as confidential, that understanding at sidebar will

10:49:12  10    be followed, which is that the specific examples that

11    Mr. Bramwell gave of portions of those documents he would like

12    to use do not to the Court at first blush seem to contain

13    confidential and sensitive information in and of themselves;

14    and, therefore, as long as the argument is limited to those

10:49:33  15    provisions in the way that was discussed at sidebar, counsel

16    should be able to refer to those provisions and opposing

17    counsel respond to those arguments without getting into other

18    matters that truly are confidential and sensitive and might

19    require special procedures.

10:49:52  20         If at any time either counsel feels that you need to

21    go beyond those limits, or, for example, specifically

22    reference names of individuals, details of circumstances that

23    might identify individuals or get into more sensitive areas or

24    get into internal procedures and practices relating to tenure

10:50:18  25    or otherwise that are not the types of things that folks in

1    general in the academic community would be generally aware of,

2    let me know.  We'll stop, we'll have a sidebar, and we'll

3    decide if any special procedures are needed.  Okay?

4              Okay.  Do we have an understanding?

5              MR. RUMBAUGH:  Thank you, your Honor.

6              MR. BRAMWELL:  Thank you, Judge.

7              THE COURT:  Okay.  So then we will begin with

8    plaintiff's counsel.  As I indicated, Mr. Rumbaugh, if you'd

9    like to have a seat at the table, you are welcome to do that

10   while I hear from Mr. Bramwell.

11             Mr. Bramwell, you may begin when you are ready.

12             MR. BRAMWELL:  Good morning, Judge, and may it please

13   the Court.  Jerry Bramwell for Professor Smith.

14             We are here to discuss the injunction of a continued

15   violation of the Handbook.  This claim arises under Illinois

16   law, and, Judge, here's the contract.  It is the Handbook.  It

17   is the DePaul University Faculty Handbook that is attached as

18   Exhibit 1 to the complaint.  DePaul agrees that this is a

19   contract.

20             There's no legitimate dispute that Terry Smith's a

21   tenured professor of law at DePaul University.  Tenure creates

22   the presumption of continuing employment unless the university

23   proves that countervailing circumstances exist.  That's

24   Handbook Section 3.1, lines 21 and 23.

25             And if your Honor needs a hard copy, I can provide

10:50:36

10:50:47

10:51:00

10:51:23

10:51:42

1     you one very quickly.

2          It's also Handbook Section 4.1.  Tenured faculty may

3     only be dismissed under the provisions set out in this

4     Handbook.

5          The alleged countervailing circumstances in this case

6     are, quote/unquote, "misconduct through an alleged pattern of

7     bullying."  Now, Judge, as an initial matter, bullying is not

8     misconduct.  Misconduct under the Handbook is "a pattern of

9     extreme intimidation and aggression."  That's handbook Section

10    4 --

11          THE COURT:  So let me stop you there for a minute.

12          Are you saying that the problem here is that they

13    used the word "bullying" instead of saying "a pattern of

14    extreme aggression and intimidation" on this particular point?

15          I understand that you have many complaints about the

16    way this process was handled, but I'm wondering if this is

17    really just a technical point that they didn't use the right

18    word to constitute something that would be covered by the

19    agreement, or whether you actually think substantively

20    bullying is something different than extreme intimidation or

21    aggressive intimidation, et cetera?

22          MR. BRAMWELL:  We do believe that bullying is

23    separate and distinct from the idea of extreme intimidation

24    and aggression, and here's why.  The only time that any

25    document that we have ever seen that references extreme

1    intimidation and aggression occurs in any of DePaul's

2    literature, we cite that in our reply, and that really talks

3    about -- the reply links to DePaul's own website, and extreme

4    intimidation and aggression really talks about physical

10:53:32   5    extreme intimidation and aggression, throwing staplers,

6    stalking, menacing, not just being mean to somebody.

7         THE COURT:  So -- and what's referenced in your reply

8    brief is a Q and A that describes a scenario --

9         MR. BRAMWELL:  Right.

10:53:53   10        THE COURT:   -- where one colleague engages in

11   behavior towards another colleague.  Why is this a definition

12   rather than just -- just a scenario to provide guidance to the

13   parties?

14        Usually in my experience, the reason that you provide

10:54:13   15   a Q and A example in a FAQ section in order to explain a

16   policy is because you're actually pointing to something that

17   might be unclear as to whether or not it falls under whatever

18   provision you're talking about.

19        So rather than being a definition, it's more of a,

10:54:33   20   you know, let's give you some guidance on this area where it

21   might not be clear.

22        Why is it that you think this Q and A should actually

23   be considered as defining what constitutes intimidation and

24   aggression?

10:54:47   25        MR. BRAMWELL:  Because this is the only guidance that

1   we have ever seen anywhere.  There's no guidance in the

2   Handbook.  There is guidance in the -- in the Code of Conduct.

3   We haven't seen any guidance anywhere.

4           Generally under basic principles of contract law, any

10:55:04   5   ambiguity is construed against the drafter, against the people

6   that are promulgating the standards.  The people that are

7   promulgating the standards, the drafters, are DePaul.

8           This is the only guidance that has been offered with

9   respect to what is extreme intimidation and aggression.

10:55:21   10  Judge, this is an admission by silence.

11          Looking at you, it doesn't sound like you're buying

12  this argument, so --

13          THE COURT:  I wouldn't make any assumptions during

14  the argument, for sure.

10:55:38   15          MR. BRAMWELL:  Okay.  But if you've got no further

16  questions on this point, I'll continue.

17          THE COURT:  Please move on.

18          MR. BRAMWELL:  So let's assume for the sake of

19  argument that the university has a belief that misconduct is

10:55:51   20  occurring.  What do we do about that?

21          Well, Judge, we go to Handbook Section 4.4.3.  There

22  is a seven-step process.  I have outlined, maybe done a set of

23  bullet points here.  This is what we do.  We go to

24  Section 4.4.3, and why do we go to the section?  Because

10:56:15   25  that's what the Handbook requires.

1        Remember, Section 4.1 of the Handbook says the only
2   way that you can discipline, terminate a tenured professor is
3   to follow Chapter 4.

4        So when we were here I believe it was August 14th,
5   you -- and if you need copies, hard copies of something, I
6   can --

7        THE COURT:  That's fine.  I've got everything here.
8   Just making sure I have it all.

9        Go ahead.

10       MR. BRAMWELL:  When we were here on August 14th, you
11  said, counsel, I'm particularly interested in irreparable
12  harm.  All right.  So where is the irreparable harm for
13  failing to follow the seven-step process?

14       Judge, we're going to go right back to Section 4.1.
15  Section 4.1 says we strictly adhere to this process.  Why?  We
16  do it to protect faculty against arbitrary and capricious
17  decisionmaking.  We do it to protect faculty from what's going
18  on here, a Dean and a Provost ganging up on faculty that
19  are -- on a faculty member that is not popular and not well
20  loved.

21       We do it to protect academic freedom.  All seven
22  steps of this process are necessary for that protection.  The
23  failure to adhere to the seven-step process leads to a bad
24  process.  It makes the protections of tenure illusory.

25       Now, Judge, under Illinois law, we require employers

10:56:36

10:56:44

10:57:03

10:57:26

10:57:50

1    to adhere strictly to their policies.  That's the lesson of

2    *Hentosh.*  That was the case involving the failure of a

3    university to actually follow its own tenure process.

4              THE COURT:  So about *Hentosh* --

5              MR. BRAMWELL:  Okay.

6              THE COURT:  -- that opinion dealt with an injunction

7    that would be imposed post-trial, correct?

8              MR. BRAMWELL:  That's right.

9              THE COURT:  That was not a preliminary injunction.

10             How does the guidance, such that it is from *Hentosh*,

11   apply in this situation, where we're talking about preliminary

12   relief rather than prospective relief after a finding on the

13   merits?

14             MR. BRAMWELL:  Right.  Judge, the only way that you

15   can actually -- I'm sorry -- the only way that one can give

16   effect to the seven-step process at this point is to enjoin

17   the process.

18             Here's what's going to happen if there is no

19   preliminary injunction, as you saw from Exhibit A in our

20   reply.  This process is continuing.  We have some deadlines

21   coming up.  We're going to have a hearing that occurs.  We

22   have violated, as you can see from this chart and we'll get

23   further into it, every -- not every, but almost every

24   provision otherwise.  The only way to give effect to the

25   process right now is to stop it in its tracks.

10:58:09

10:58:21

10:58:40

10:58:57

10:59:21

1    THE COURT:  How does that relate to the *Hentosh*

2  opinion, though?  Because apparently, I don't know the history

3  of that case, but there's no indication that there was a

4  preliminary injunction ordered in that case, which would seem

10:59:38    5  to suggest that either the parties or the judge thought that

6  it wasn't necessary to have preliminary relief and that it

7  could be addressed through an injunction after the fact.

8    MR. BRAMWELL:  Or the parties didn't think to file a

9  motion for a preliminary injunction.

10:59:52   10    The rule of *Hentosh* and the rule of *Klein*, these

11  cases are important because they establish the rule in

12  Illinois that an employer must strictly comply with its own

13  rules.

14    And the only way we can have strict compliance is to

11:00:13   15  order at this stage for DePaul, really at this stage to

16  suspend the process pending a full trial on the merits, and

17  procedurally we suspect that this is actually going to be done

18  on cross motions for summary judgment.

19    THE COURT:  Is there any barrier to Professor Smith

11:00:32   20  raising these procedural objections in front of the Faculty

21  Council?

22    MR. BRAMWELL:  There is not that I know of.

23    THE COURT:  So why shouldn't I wait at least until he

24  has an opportunity to get in front of the Council and say this

11:00:51   25  whole proceeding should be dismissed because it was improperly

1   instituted, et cetera, et cetera, et cetera.  Mightn't the

2   Council agree with him?

3          MR. BRAMWELL:  It might, and actually, Judge, I

4   misspoke.  He can't raise it to Faculty Council, he could

5   raise it to the Hearing Committee.  Those are separate organs.

6          THE COURT:  That's fair, and I should distinguish

7   that, too.

8          So the Hearing Committee, is that the three-person --

9          MR. BRAMWELL:  It's a three-person committee.

10  Nobody's a lawyer.

11         THE COURT:  Okay.  So why can't he raise it to the

12  Hearing Committee?

13         MR. BRAMWELL:  He can raise it to the Hearing

14  Committee.  He has raised it to the Hearing Committee, and my

15  friend over here has said -- made the argument, well, what if

16  he wins?  He can raise this to the Hearing Committee, and he

17  might ultimately win.

18         And to that, Judge, I would say what if he loses?  He

19  then has to continue with this process.  If he loses at the

20  Hearing Committee, he will then be --

21         THE COURT:  Why not wait until he loses to come in on

22  your motion for the preliminary injunction?  I mean, the

23  process stops there.

24         Because if the real injury he suffered is a denial of

25  process rather than at this point being terminated, why

11:01:10

11:01:21

11:01:29

11:01:48

11:02:06

1  shouldn't he at least be denied the process by the Hearing

2  Committee before he comes in for this injunction?

3         MR. BRAMWELL:  Well, let's take a look at what has

4  happened so far.  And this is going to be a little bit of a

11:02:23  5  roundabout way to answer your question, so I hope you'll give

6  me a little bit of --

7         THE COURT:  As long as you get there.

8         MR. BRAMWELL:  I will get there.

9         This is a brand new easel, so I hope that it works.

11:02:33  10         So let's take a look at what actually happened.  The

11  record before the Hearing Committee is so bad that we don't

12  believe that the Hearing Committee can actually do their job

13  properly.

14         For example, this should not, from our perspective,

11:02:54  15  should not even have gotten to the Hearing Committee because

16  Professor Smith was denied his interlocutory review by the

17  Provost.  How was he and why was he denied his interlocutory

18  review by the Provost?  Because the Provost kicked off the

19  investigation.

11:03:08  20         That is the very first chapter of the Powers

21  Report -- I'm sorry, the very first paragraph of the Powers

22  Report, and unless my colleague objects, I'll just read it.

23         THE COURT:  Okay.  This is the first paragraph of the

24  report.

11:03:23  25         MR. BRAMWELL:  The first paragraph.  "This

1   investigation was initiated and the resulting report was

2   prepared at the request of Dr. Marten denBoer, Provost of

3   DePaul University.  During the academic year, 2016-2017,

4   DePaul University College of Law faculty members raised

5   complaints to the COL Dean Jennifer Perea Rosato" -- I think

6   he should have flipped that -- "as well as to the Provost

7   against other COL faculty members and/or Dean Rosato.  They

8   alleged intentional behavior occurred that disrupted the COL

9   processes and meetings related to the tenure and promotion

10  process, caused procedural irregularities in that process, and

11  constituted misconduct.  To determine whether any COL faculty

12  member engaged in misconduct, the Provost engaged external

13  investigators to review documents, interview witnesses and

14  assess the complaints made.  For the purpose of this

15  investigation, the term 'misconduct' means a violation of the

16  standards of expectation set forth in Section 4.4.1 and

17  Section 6.4 of the university Handbook."

18          So the record before the faculty -- sorry, the record

19  before the Hearing Committee right now already is the Provost

20  having initiated an investigation.  We've missed our first

21  interlocutory review.

22          It is Dean Rosato then, having conducted an

23  investigation without having spoken to Terry Smith or Sumi Cho

24  with respect to anything that happened during the process.  If

25  you also look at Dean Rosato's investigation, and that is

1    Exhibit D to our initial moving papers, she claims to have

2    spoken to 20 faculty members.  Information from only four

3    faculty members is in the record.  What's going on with the

4    other 16?

11:05:19    5    The -- and Dean Rosato made, you know, a slew of

6    other issues which I intend to talk about later on in the

7    argument.  The bottom line though is to answer your specific

8    question, why can't the Hearing Committee make its decisions?

9    The Hearing Committee already has a bad record in front of it,

11:05:39   10    a terrible record in front of it.  These are not lawyers.

11    And going back to *Hentosh* and *Klein*, the university

12    is supposed to follow its own procedures.  It's not even

13    supposed to get to the Hearing Committee at this stage.

14    THE COURT:  Is your concern that the Hearing

11:05:59   15    Committee cannot be impartial?

16    MR. BRAMWELL:  That is a fear.  The other issue, of

17    course, Judge, is that the Hearing Committee was selected

18    improperly.  As we mentioned both in our moving papers and in

19    our -- I don't think it's in the reply, but in our moving

11:06:20   20    papers, the Hearing Committee was selected improperly.

21    The way the Hearing Committee is supposed to be

22    selected understood the plain language of the Handbook is that

23    Faculty Council is supposed to review and ratify the names of

24    the volunteers that agree to be interviewed for purposes of

11:06:39   25    serving on the Hearing Committee.  Instead what happened was

1    the Committee On Committees, a subcommittee of Faculty

2    Council, made this determination.

3            Now, why is this relevant?  Under the prior version

4    of the faculty Handbook, the version that existed prior to

11:06:59    5    January 1st, 2016, it was expressly the Committee On

6    Committees that was supposed to determine the potential

7    members of the Hearing Committee.  In this case, we have -- or

8    the way the current faculty Handbook is supposed to be set up

9    or is set up, the full Faculty Council is supposed to review

11:07:18   10    and ratify.  More transparency.  That's not what happened in

11    this case.

12            So actually, Judge, the Hearing Committee cannot

13    even -- should not even be hearing this case because the

14    Hearing Committee members were improperly selected.

11:07:31   15            And we objected at every legitimate -- every

16    available point to the selection of the Hearing Committee

17    members.

18            So --

19            THE COURT:  Without getting too far afield on that

11:07:47   20    last point, is there an actual statement somewhere in the

21    Handbook that prohibits or bars in some way the delegation of

22    the selection of the committee?

23            MR. BRAMWELL:  There is not, Judge.  No, there is

24    not.  But this is a question of interpretation of a contract.

11:08:13   25    Question of interpretation of a contract, Judge, as you know,

1 is a question of law for you.

2       I would also say two things in favor of my -- of our

3 interpretation of that.  No. 1 I've already said is the prior

4 version of the Handbook specifically said Committee On

5 Committees.  That standard has been changed now to Faculty

6 Council.  So when you have a change in standards, when the

7 legislature changes a statute as you know, it is assumed --

8 presumed that it did so for a reason.  Just so here.

9       Second, ambiguity is interpreted against the drafter.

10 The drafter was DePaul.  It wasn't -- it wasn't Terry Smith.

11       THE COURT:  Okay.

12       MR. BRAMWELL:  So we've talked about Illinois law

13 requiring employers to adhere strictly to their own processes.

14       We've talked about what happens if this process

15 continues to go forward.  Judge, what if he loses?  He's back

16 here.  He's going -- there's going to be more litigation on

17 this.  When he -- when we believe obviously he wins, otherwise

18 we wouldn't have filed the suit, so he wins, what's the

19 remedy?  The remedy is that he is going to then be, just like

20 in *McAdams v. Marquette*, the remedy is back wages and

21 reinstatement.  Okay.  He's now reinstated.

22       DePaul University, what's it going to do?  It is

23 going to start the discipline machine all over again.  So he

24 is going to have this Court tell DePaul reinstate.  All right,

25 fine, you're reinstated.  Let's just start this disciplinary

1  machine all over again, as opposed to getting it right the

2  first time.

3      THE COURT:  So let's say that you're right --

4      MR. BRAMWELL:  Okay.

5      THE COURT: -- and the process that he's being put

6  through is just all wrong.  It is completely contrary to

7  what's provided for in the Handbook.

8      MR. BRAMWELL:  Right.

9      THE COURT:  But he still goes through the process and

10  at the end of the day, he's vindicated.

11      MR. BRAMWELL:  Okay.

12      THE COURT:  And he gets to keep his job and the panel

13  says you're a tenured professor, you're going to stay a

14  tenured professor.

15      MR. BRAMWELL:  Right.

16      THE COURT:  If that were to happen, would he have a

17  breach of contract claim?

18      MR. BRAMWELL:  He -- the contract would be breached,

19  and then what's the remedy?

20      THE COURT:  Well, that's not really what my question

21  is because in order to have a breach of contract claim in

22  Illinois, you have to have an injury.

23      MR. BRAMWELL:  Exactly.

24      THE COURT:  The injury is actually an element of the

25  claim.

1       MR. BRAMWELL:  Yep.

2       THE COURT:  So my question is, if he goes through

3  this bad process but he gets to keep his job, does he still

4  have an injury such that he could bring a breach of contract

11:11:04  5  claim?

6       MR. BRAMWELL:  And, Judge, I hate to answer your

7  question with another question, but I'm trying -- I have

8  actually spent probably more time than I would like to, and

9  certainly my client would like to when he gets the bill,

11:11:19  10  trying to answer that question.

11       What remedy would he have?  What is the injury?

12  Because --

13       THE COURT:  And that's the difference here.  I'm

14  drawing a distinction between remedies and injuries here on

11:11:32  15  purpose.

16       MR. BRAMWELL:  Okay.

17       THE COURT:  And I would like an answer, and --

18       MR. BRAMWELL:  Yes.

19       THE COURT:  -- not a question, which is does he still

11:11:37  20  have an injury to support a breach of contract claim if he

21  goes through a bad process but gets the result he wants?

22       MR. BRAMWELL:  And I'm having a very hard time

23  finding what that injury would be.  I think the only relief

24  can be equitable because of that.

11:11:54  25       THE COURT:  Well, under your argument, it seems that

1   your best case would be that he was still denied process.  If

2   being denied process is an injury in and of itself --

3           MR. BRAMWELL:  Right.

4           THE COURT:  -- why aren't you arguing that he would

11:12:09   5   still have a breach of contract claim because he still

6   suffered an injury?

7           MR. BRAMWELL:  Well, the contract would have been

8   breached, but then the question becomes what is the -- what is

9   done about that breach?  Because what is the measure of

11:12:26   10   damages?

11           He would have been vindicated, so he keeps his job.

12   The -- the harm caused is the -- is having to have gone

13   through this process, the phrase, of course, the process is

14   the punishment.

11:12:43   15           But contract law, and --

16           THE COURT:  It's a little different.

17           MR. BRAMWELL:  Yeah, exactly.

18           So the only way, you know, to vindicate the rights is

19   to halt the process at this point, only way to vindicate

11:13:00   20   Professor Smith's right is to halt the process at this point

21   pending a full hearing on the merits.  And, again,

22   procedurally what happens are cross-motions for summary

23   judgment as to the process and the procedure.

24           THE COURT:  One of the things that I think makes your

11:13:18   25   argument difficult is that there are many references in

1    plaintiff's papers to due process.  Due process for us lawyers

2    typically refers to a concept that's often rooted in the

3    Constitution and the Fifth Amendment and the Fourteenth

4    Amendment and state rights, but it also usually applies to

5    state actors.

6            MR. BRAMWELL:  Right.

7            THE COURT:  And the source of the right to due

8    process is rooted in federal or state Constitution and it

9    applies to state actors.

10           Here, the process that your client is trying to

11   enforce is based on a contract.

12           MR. BRAMWELL:  Uh-huh.

13           THE COURT:  So it seems to me that some of the

14   references to due process and some of the due process rights

15   that he's asking for, such as not having a witness and the

16   fact finder be the same person, that might make sense if we

17   were talking about a claim for procedural due process against

18   a state actor.  I didn't see any guarantee in the Handbook,

19   however, that you not have the fact finder also be a witness

20   in the proceeding.

21           Aren't you confusing these concepts of contract law

22   and constitutional due process?

23           MR. BRAMWELL:  So I'm sorry that the -- that it came

24   across as constitutional due process.  The Handbook talks

25   about the Dean conducting an investigation.

1       THE COURT:  Okay.

2       MR. BRAMWELL:  And that is step one of the process.

3   So the Dean is supposed to conduct an investigation.

4       The Handbook doesn't quite describe what

5   investigation means, but, you know, and, again, contract

6   interpretation is a question of law for you.

7       We submit the only -- that the only real way to

8   interpret "the Dean conducts an investigation" is that the

9   Dean conducts a good-faith investigation and a fair

10  investigation.

11      Why is that?  I hate to say duty of good faith and

12  fair dealing, but in every contract, there is -- just because

13  it's got some bad baggage to it, that phrase, but, Judge, in

14  every contract, there is a duty of good faith and fair

15  dealing.

16      That means that what would the contracting parties

17  assume this meant?  And "the Dean conducts an investigation"

18  has to mean the Dean conducts a good-faith investigation and a

19  fair investigation.

20      A good-faith investigation, a fair investigation, you

21  see this in the line of cases, and I can provide some

22  post-hearing briefing very quickly for you.   You see it in

23  the line of cases with respect to discrimination.  Good-faith

24  investigations, fair investigations mean you talk to both

25  sides before making a decision.  The EEOC, I believe, has

1    issued guidance on that.

2           THE COURT:  But you could contract around that.

3           MR. BRAMWELL:  You could, but we haven't, and any

4    ambiguities, again, are interpreted against the drafter, and,

11:16:29   5    again, you know, the duty of good faith and fair dealing

6    inherent in every -- in every contract means that an

7    investigation should be a good-faith investigation.

8           THE COURT:  And it's necessarily in bad faith for

9    somebody who has personal knowledge of the facts to also be a

11:16:51   10   decisionmaker?

11          MR. BRAMWELL:  Yes, Judge.  You wouldn't allow it in

12   your court if a juror was also going to be a witness.  You

13   know, even if the rules of evidence were silent on that point,

14   your own equitable powers would not allow that.

11:17:12   15          You wouldn't have -- it just wouldn't -- you just

16   wouldn't do it.  It's -- it's Fairness 101.  You wouldn't have

17   somebody make a decision, and Dean Rosato made actual

18   decisions as to what Professor Smith allegedly did.  "I must

19   conclude that Terry Smith attempted to derail the process"

11:17:38   20   before even speaking to him.

21          Terry Smith did this.  Terry Smith did that, Terry

22   Smith did the other.  These aren't, you know, just basic

23   charges, I believe the evidence supports such and such.  These

24   are affirmative conclusions.  By the time that these charges

11:17:58   25   were issued, really the only thing in dispute was what was the

1   recommended punishment going to be, and you can see that with

2   respect to what Dean Rosato actually wrote and the way that

3   she comported herself throughout this process.

4          I mean, she -- when you read Exhibit D to our

11:18:21   5   original moving papers, you know she's already determined

6   misconduct occurred.  All we're talking about now is what's

7   going to happen to Professor Smith.

8          Unless you've got additional questions, Judge, on

9   irreparable harm or lack of adequate remedy at law, I'll move

11:18:49   10   on briefly to the balance of hardships.

11          THE COURT:  Go ahead.

12          MR. BRAMWELL:  Judge, the balance of hardships weigh

13   in favor of Professor Smith.  We're dealing with, for

14   Professor Smith, the loss of his tenure, the loss of his

11:19:04   15   career.

16          For DePaul, there really is no hardship.  DePaul gets

17   to keep its teacher.  It gets to keep somebody who's doing

18   great research.  There is no exigent emergency by having

19   Professor Smith remain on the faculty.  If there were, DePaul

11:19:29   20   would have triggered its emergency procedures.  DePaul would

21   have -- and DePaul hasn't, even though it first started

22   investigating him last April with the Powers Report and the

23   Tellman Report.

24          Further, there is no fear at all that this behavior

11:19:56   25   is going -- there is no legitimate reason to believe this

1    behavior is likely to continue.  Why?  Because there are no

2    untenured faculty left at the College of Law.  So Terry Smith

3    cannot write more minority reports.  Who's he going to write a

4    minority report against?

5    THE COURT:  No, but isn't their complaint actually a

6    little broader?  They're not saying specifically the one way

7    that he torments his colleagues is by writing these reports.

8    Isn't the allegation that he torments his colleagues on an

9    ongoing daily basis in a variety of ways, including using

10   profanity and yelling at them, and that this example of the

11   two junior faculty members having their tenure application

12   opposed is maybe one example of that, but it seemed as if the

13   broader course of conduct that's alleged -- I'm not saying I

14   think it's true at this point -- but it's actually much

15   broader than just he's trying to stop people he disagrees with

16   from getting tenure.

17   MR. BRAMWELL:  All right.  Well, if you're concerned

18   about these email blasts that he sends out, just don't redeem

19   him.  There's nothing Terry Smith can do to any tenured

20   faculty member.  He can't affect their salary, parking spot,

21   the like.

22   And if Terry Smith were really getting in people's

23   faces and making them feel physically unsafe, call the police.

24   That's what the police are there for.  The police have not

25   been called.

1    THE COURT:  So I want to give you a chance before we

2  run out of time and I enforce it to touch on the merits as

3  well, the likelihood of success on the merits.  You know, I've

4  read the papers, probably will spend some more time with the

11:21:48    5  exhibits.

6    I will say the defense has attempted to counter

7  basically all of the seven procedural points that Professor

8  Smith's claims were not met here.

9    MR. BRAMWELL:  Uh-huh.

11:22:08    10    THE COURT:  I actually, looking at the record, it's

11  not clear to me that all their points are mistaken.

12    So kind of in a nutshell, can you hit on what you

13  think are the most egregious and concerning breaches of the

14  contract and its process that I should be focused on?

11:22:34    15    MR. BRAMWELL:  Absolutely, Judge.

16    First, the Provost initiated the investigation.  That

17  was clear right from Paragraph 1 of the Powers Report.  This

18  was a Provost-led investigation.

19    Why does that matter?  Because the Provost down here

11:22:50    20  is supposed to actually act as the first interlocutor.

21    THE COURT:  But doesn't that require me to assume

22  that the Dean's investigation that she formally initiated is

23  just a continuance of the same project that the Provost was

24  concerned about?

11:23:11    25    MR. BRAMWELL:  Well, the Provost shares his results

1 of his investigation with the Dean, and as we read the Powers

2 Report, remember, we didn't get the Powers Report until

3 October -- I'm sorry, October -- August 24th when it was

4 finally produced to us, and you look at the Powers Report and

11:23:25    5 you say, my gosh, if you take the Powers Report -- and I may

6 reference some information in the Tellman Report right now, I

7 don't know if you want to take that on sidebar.

8            THE COURT:  Out of an abundance of caution, let's do

9 it at sidebar, and then we'll see if we can keep that brief.

11:23:50   10           (Sealed proceedings heard at sidebar:)



11

12

13

14

11:24:02   15

16

17

18

19

11:24:24   20

21

22

23

24           (Proceedings heard in open court:)

11:24:38   25           MR. BRAMWELL:  So you take those reports and you get

1  what the Dean has done, which is just a continuation of these

2  bad processes.  The Dean then determined Professor Smith

3  committed misconduct before even speaking with him.  Before

4  seeing any of his evidence, she made affirmative conclusions.

11:25:01  5  Well, Judge, how does that mesh with --

6  THE COURT:  So the Handbook requires the Dean to

7  attempt an informal resolution.

8  MR. BRAMWELL:  Uh-huh.

9  THE COURT:  Didn't she attempt one by trying to

11:25:12  10  schedule the meeting, and then he wasn't available for three

11  months?

12  MR. BRAMWELL:  The facts there, and I was party to

13  that as well as one of Mr. Rumbaugh's former partners, Amy

14  Schmidt Jones.  Dean Rosato was actually not party to those

11:25:30  15  discussions despite her affidavit, but Step 2 of the process

16  is not something that we are arguing.

17  We believe it's a problem, but we're not arguing that

18  that is the -- if all that happened was Step 2 of the process

19  was missed, at least I would not be here.

11:25:48  20  THE COURT:  Okay.  And so when you say then that it's

21  a problem that she concluded her investigation without

22  speaking with Professor Smith, that is not then a reference to

23  trying to informally resolve it.

24  MR. BRAMWELL:  Correct.

11:26:08  25  THE COURT:  Is that some other general concept of an

1    investigation isn't fair unless you talk to the subject?

2         MR. BRAMWELL:  Yeah.  You've got to get both sides,

3    and you see that in EEOC guidance.  And I can give you case

4    law on that point, both federal and state case law on that

5    point if you're interested in it, post-hearing briefing.  But,

6    yes, that is the principal problem with this, one of the major

7    problems with Dean Rosato's investigation.

8         THE COURT:  Okay.  That's helpful.

9         MR. BRAMWELL:  Okay.

10        THE COURT:  What are the other -- the most egregious

11   violations of his rights?

12        MR. BRAMWELL:  So we've got the Provost led.

13        We've got Dean Rosato making conclusions way out of

14   sequence.

15        We have the Provost being unavailable to conduct an

16   initial first-level review.  Why?  Because he's already

17   determined that there was misconduct because the Powers Report

18   says there was misconduct.

19        And then you've got a bad Hearing Committee

20   selection.

21        THE COURT:  Okay.

22        MR. BRAMWELL:  Now, if I may have another minute or

23   two, I can respond to -- I know there's a litany of case law

24   in defendants' brief stating that preliminary injunctions are

25   not appropriate, and I would just distinguish that litany of

1   case law by saying in that case law, *Simpson* and a whole slew

2   of other cases that they've cited, in those cases, A, we're

3   not dealing with Illinois law; B, more importantly, the

4   disciplinary action, the removal of the employee had already

11:27:54   5   occurred in those cases.

6           In this case, Terry Smith is still an employee, so I

7   would just preemptively distinguish those cases.

8           If you've got other questions about them, I can go

9   through them.  Otherwise, I can sit down and be quiet.

11:28:10   10          THE COURT:  I do not have any further questions at

11  this point.

12          MR. BRAMWELL:  All right.  Thank you, Judge.  If you

13  have additional questions as this process continues, I will

14  stay here as long as necessary to answer them.

11:28:20   15          THE COURT:  I appreciate that.

16          Mr. Rumbaugh, since your colleague has used a big

17  demonstrative as part of his presentation, I will let you

18  refer to it during your argument if you would like.

19  Otherwise, he can take it down so it's not distracting you.

11:28:34   20          MR. RUMBAUGH:  I do not need it.  I will let my

21  former colleague do with it as he wishes.

22          So I'm going to, the way I intend to approach my time

23  is I'm going to -- I view the contract pieces as being a red

24  herring.  We deny breaching the contract.  I'm going to come

11:28:54   25  back and address part of the red herring, the contract pieces

1    that counsel asked the Court to focus on.

2          But the thing, when we first -- when we last met, the

3    Court told us to focus on, and I'm going to focus most of my

4    time on this, is the law regarding enjoining employment

5    proceedings.

6          As this Court held, and this was what -- what I'm

7    going to talk about first and I'll -- I'm going to divert back

8    to the contract pieces and I'm going to come back to what the

9    case is really about, but I'll start with a little

10   introduction about what the hearing -- what the Court said

11   when we last met with the Court said this hearing would be

12   about, I'm going to start with it.  Then I'm going to side

13   rail to the highlights of the contract pieces which we deny,

14   and then I'm going to come back to the main part of the case,

15   which is the law regarding enjoining employment proceedings.

16         As this Court correctly held in *Vignola vs. 151 North*

17   *Kenilworth Condominium Association*, and I'm quoting from your

18   Honor, "A preliminary injunction is an extraordinary and

19   drastic remedy that should not be granted unless the movant

20   carries the burden of persuasion by a clear showing."

21         It hasn't happened.  It's not going to happen.

22         When we filed, when we last spoke, we said to the

23   Court there hasn't been, we haven't seen and we haven't cited

24   and opposing counsel hasn't cited one case in which a court

25   has enjoined a disciplinary proceeding before the conclusion

1    of that proceeding.

2         And I kind of gaffed when I said it, I was like, oh,

3    I predicted what would happen today is opposing counsel would

4    come up with something, we'd have to distinguish it.  They

5    haven't.

6         And on reflection, when we've cited dozens, and we

7    could cite dozens more, where courts have refused to enjoin a

8    proceeding in motion.  Why?  Well, the answer is simple.

9    There's a U.S. Supreme Court case which is the case which has

10   just gotten mentioned at the very end of counsel's argument,

11   but there's a case that's on point, and there's Seventh

12   Circuit progeny of that case.  And that is controlling on

13   this -- on this proceeding, and it's the elephant in the room.

14   *Sampson vs. Murray.*

15        In *Sampson*, a federal employee tried to stop an

16   internal disciplinary proceeding and said that if she didn't

17   get an injunction, she would be irreparably -- be irreparably

18   harmed because "spurious and unrebutted charges against her

19   might remain on the record and she would suffer the

20   embarrassment of being wrongfully discharged in the presence

21   of co-workers."

22        And the U.S. Supreme Court said, and again I quote,

23   the Supreme Court said that lost earnings and reputational

24   harm "fall far short of the type of irreparable injury which

25   is a necessary predicate for the issuance of a temporary

1   injunction."

2          So all of the harms that plaintiff talked about --

3   I'd lose money, I'd have to go through a process, I'd lose

4   reputation, I'd have to hire an attorney -- all of those

5   things are present in every employment case, and they're

6   reparable.  The Court knows how to repair them.  You can

7   enjoin -- all of the injunctions plaintiffs cite in his brief

8   are after the proceeding is over.  You win.  You get -- the

9   Court orders you reinstated.

10          So the -- after a trial, after this trial or the next

11   trial or after the internal proceeding, the Court could enter

12   all the relief plaintiff wants, and the Supreme Court has said

13   in employment cases, here are the rules.

14          THE COURT:  But I also think there's another reason

15   why there aren't that many cases on point, which is that in

16   many of these circumstances the employer, when confronted with

17   the possibility of a lawsuit, might just wait until after the

18   lawsuit.

19          MR. RUMBAUGH:  Maybe.

20          THE COURT:  What's the school's rush here?  Why rush

21   into this process which could be very divisive in the

22   university, and then if Professor Smith prevails in his

23   lawsuit and gets reinstated in some way, it just creates even

24   more rancor.

25          It seems to me that one could argue that there really

1       isn't any harm to the school in waiting, and if I am going to

2       balance hardships, that there's no real hardship in the school

3       in waiting; and on the other hand, it could be incredibly

4       disruptive if they go through with the process, it creates all

11:33:16    5   this discord, and then Professor Smith is vindicated at the

6       end of the day.

7               MR. RUMBAUGH:  I do want to come back to the Seventh

8       Circuit cases interpreting *Sampson* which address this issue,

9       but the answer is there isn't -- you're right.  There hasn't

11:33:30   10   been a rush.  It's 16 months into this process, and the

11      process took years to get here.

12              The Law School and the university have been getting

13      pilloried for not dealing with this problem.  Every third

14      party that comes in and looks at the College of Law says, my

11:33:46   15   gosh, you've got a civility problem.  And the third parties

16      that look at Professor Smith specifically flag these issues.

17      In fact, the main criticism of the Law School is dragging its

18      feet in dealing with this.

19              So when you say there's no rush, the answer is

11:34:04   20   precisely.  Just so.  The good argument is the Law School

21      should have tackled this years ago, but now we're 16 months

22      into a procedure waiting longer.  There are -- there are --

23      counsel talked about, you know, there's no harm.  You know,

24      people just don't open your email.

11:34:22   25          Think about it.  In this era, people are -- there's

1   credible evidence from multiple third parties and through an

2   expensive investigation that there are people who are victims

3   of intimidation and bullying, and those people don't want to

4   be on committees.  They don't want to serve.  They don't want

5   to participate in shared governance.  They don't speak because

6   they're victims.

7       Now, the Court doesn't -- it said earlier that I'm

8   not accepting that those claims are true or not, but the Court

9   noted there's a long laundry list of things that have happened

10  that have victimized members of the College of Law.  And so

11  you're right, there isn't a rush, but we're way behind

12  schedule as it is now.  Waiting another couple months or

13  couple years severely prejudices the Law School.

14      It's -- I don't think it's overstating -- I don't

15  think it's overstating to say that the -- dealing with the

16  civility problem of whom the chief culprit is Professor Smith

17  is the biggest problem facing the Law School, and it's an

18  existential threat to the Law School.  They can't run the

19  railroad without fixing this.

20      So -- and I would submit that the reason why we can't

21  find, they can't find, even though that would have been the

22  way to win this hearing, is find a case where a court enjoined

23  a proceeding in process is because the Supreme Court said no,

24  and the Seventh Circuit in *Bedrossian* said, and again, I'll

25  quote, "The Supreme Court set a high standard for obtaining

11:34:40

11:34:53

11:35:12

11:35:31

11:35:49

1   preliminary injunctions restraining termination of employment.

2   Although it did not foreclose the genuinely extraordinary

3   situation, the type of irreparable injury required must really

4   depart from the harms common from most discharged employees.

5   The plaintiff in *Sampson* alleged humiliation, damages to

6   reputation and loss of income due to her purportedly wrongful

7   termination from federal employment.  The court held that

8   these injuries do not rise to the level of an extraordinary

9   termination of employment situation and that they were not

10  'irreparable'" -- quotes within the Seventh Circuit's quote

11  around irreparable -- "to warrant a preliminary injunction."

12          That's it.  Read *Sampson*, read *Bedrossian.*  We're

13  done.  Now, I want -- within the family of cases and the

14  progeny of *Sampson* and *Bedrossian*, I'm going to address the

15  specific issues that are present in this case.  If we needed

16  more than that, which I submit we don't, but if we do, each of

17  the micro issues within each case are addressed in a tranche

18  of cases dealing with employees trying to stop an internal

19  proceeding.

20          And, again, as far as we can tell and as far as

21  opposing counsel has been able to tell, not once has a court

22  enjoined in a proceeding in process.  Just as the Court said,

23  you wait until the process is over.  We deny we did anything

24  wrong.  We think at the end of the day we win.  We're

25  comfortable that we win.  Our conscience is clean.

11:36:10

11:36:26

11:36:47

11:37:03

11:37:20

1         And we'll talk about the specific highlights of

2    infirmities that counsel has raised, but the legal answer,

3    according to the U.S. Supreme Court and the Seventh Circuit

4    Court of Appeals is if you're right, come back to us

5    afterwards and you can get damages in court, you can get

6    reinstated, you can get money, whatever.  But that's why we

7    haven't seen these cases.  And, again, that should be the end

8    of this discussion.

9         Now, I do want -- so I'm going to come back to the

10   progeny of *Sampson* and *Bedrossian*, which are the controlling

11   cases here.  I want an injunction to stop an internal process.

12   Where do I look?  I look at *Sampson;* I look at *Bedrossian*.

13        But counsel's flagged what he says are the biggest

14   contract issues.  I won't address all of them.  I'll address

15   the ones that counsel flagged, and if the Court wants to talk

16   about other ones, I'll address them.

17        The first one is the Powers Report.  The Powers

18   Report isn't a Section 4 process.  The College of Law, it's in

19   the record and I won't refer to the documents, but the College

20   of Law was getting multiple reports from multiple sources they

21   had multiple civility and collegiality problems.  Credible

22   third-party sources saying your railroad's broke, you got a

23   problem.  And so the Provost asks a third party to come in

24   from another law school and render a report.  He rendered the

25   report.

1      That -- the fact the report has the word "misconduct"

2   in it doesn't make it a Section 4 report.  Professor Powers

3   didn't have authority to discipline, and he didn't discipline

4   anybody.  He actually says it's beyond the scope of my power,

5   my report.

6      So to say that the Powers Report is a Section 4

7   report and so, therefore, because it was initiated by the

8   Provost *ipso facto* we did it out of order and, therefore,

9   there's two infirmities, counsel says, in the process because,

10  one, it wasn't initiated by the Dean, it was initiated by the

11  Provost, so, therefore, you breached your contract.  Nonsense.

12  There's nothing in the Handbook that says the Dean or the

13  president or the Provost or someone else can't bring in a

14  third party to address something.

15     If they want to start a Section 4 procedure, they

16  have to do it, but bringing in a third party to advise and

17  consent on what's unarguably an institutional problem doesn't

18  breach any contract.  There was no -- there's no section in

19  the Handbook that says "and you can't bring in a third party

20  to come and look at things that we're also looking at."

21     I won't address the OIDE report which I have the same

22  answer for.  It's a different report for a different reason.

23     But then -- so there were five issues that counsel

24  flagged as being the big issues.  He says you breached the

25  contract by starting the process with the Provost.  No, we

1    didn't.  The Provost asked a third party to come in and look

2    at a broad pallet of issues, some of which involved the

3    plaintiff, but not all of which.  And, again, the Provost --

4    the Powers -- Professor Powers had no authority to discipline

5    anybody.

6         Then, it comes in at No. 5 because now the Provost

7    can't perform his role and review because he already started

8    the process up front, so two of the five have to do with the

9    Provost report.  One, you started the process in the wrong

10   place; therefore, you have to start all over.

11        Two, the Provost can't perform his role because he

12   hired Professor Powers to start the Powers Report.

13        Neither one of those are factually accurate.  There's

14   no contract provision breached in either respect.

15        The second item that counsel cites as being a big

16   error in the process is that Dean Rosato didn't meet with

17   plaintiff.  There's no -- the requirement is that -- she did,

18   as the Court said, try to meet with the plaintiff, and he

19   wouldn't meet, in which we believe and allege was an effort to

20   just slow down and delay the proceeding, but there's a

21   multistep process, and the Dean met the multistep process.

22        There is a -- there's a -- there's a charge.  The

23   Dean filled out the charge.  Counsel says that the Dean formed

24   conclusions in the charge.  You have to form conclusions in

25   the charge.  It tells the respondent what they're supposed to

1    respond to.

2          Then -- so there's a statement of charges.  There's

3    nothing wrong with the statement of charges.

4          Then the faculty member has the opportunity to

5    respond to the charges.  He provides a rebuttal.  It's

6    undenied that while represented by counsel, Professor Smith

7    provided a response to the charges, as provided in

8    Section 4.4.3(3).  So there are charges which the Dean

9    provided.  Then there's a response to charges.

10         Professor Smith had a full chance to give his side of

11   the story.  It's a very extensive document with hundreds of

12   pages of exhibits.

13         Then, after we get the response to the charges, the

14   Dean prepares a report.  This is Section 4.4.3(4).  So you get

15   the charges, you get the response, you prepare a report, which

16   Professor Smith again got and, again, he's represented by

17   counsel.

18         Then Professor Smith, the respondent, gets to provide

19   a final statement under 4.4.3(5).  After reviewing the final

20   statement, the Dean then issues a decision.

21         All of those things happened, and at the response

22   point and at the final statement point, Professor Smith got to

23   provide dozens of pages of, in effect, a legal brief and

24   hundreds of pages of exhibit.  All of those steps in the

25   process happened.

1       THE COURT:  So do you disagree with the proposition

2  that there is an implied good-faith requirement inherent in

3  the procedures that are laid out?

4       MR. RUMBAUGH:  To the extent that the law would imply

11:43:53   5  a duty of good faith in anything, yes, but I don't think -- I

6  don't think that that -- I don't concede that point, and I

7  also would take the position that this is eminently a

8  good-faith proceeding.  Due process, as the Court -- the Court

9  didn't say -- started to say this, under federal law is

11:44:10  10  flexible.  Let's say federal due process applied and we're a

11  government entity.

12       Every time the Supreme Court or any other court says

13  what due process means, it starts with the cant, the litany,

14  that due process is flexible and all it requires is notice of

11:44:27  15  what you're accused of and an opportunity to be heard.

16       A party represented by counsel gets a charge.  They

17  provide a response.  They get a report.  They provide a

18  final -- a rebuttal.  Then there's a final set of charges.

19  Then, if the -- they get another level of review.  Then they

11:44:45  20  get a hearing before their peers.  Then they get another

21  appeal.

22       There is no chance that any court, if this was a

23  government employee, would look at it and say given the broad

24  range of flexibility the Supreme Court has said attaches to

11:44:58  25  due process, no one could ever say with a straight face there

1    wasn't due process here.  This -- and to the extent that this

2    goes a thousand cajillion miles beyond what any minimum

3    standard for due process would be, I would say if there's an

4    imposed duty of fair dealing explicit or implicit, it was

5    easily met.  This is an eminently fair process.

6             Somebody's going to be disappointed at the end of the

7    process, but that's true in any process.  But he absolutely

8    got notice of what he was accused of and had two huge

9    opportunities to say what his response was, and he did so with

10   gusto, taking up hundreds and hundreds of pages and killing

11   thousands and thousands of trees.

12            THE COURT:  If Mr. Bramwell is correct and there was

13   something just inherently -- just not proper about the Dean

14   running the investigation and reporting as part of the

15   investigation about things that she had firsthand knowledge

16   about, would there be an option under the Handbook for her to

17   have somebody else or recuse herself and have somebody else

18   run it?

19            MR. RUMBAUGH:  Yes, and that was actually in

20   plaintiff's initial brief, your Honor.  He raised that as an

21   issue, and then didn't raise it again in the reply.

22            Under the process, a party can ask the Dean to recuse

23   herself and appoint a designee.  She declined to do that, and

24   she said in writing that she declined to and she said why.

25   That's all --

1          THE COURT:  So Professor Smith asked her to recuse

2     herself?

3          MR. RUMBAUGH:  And she said no.  And that's in

4     plaintiff's initial brief and in our response.

11:46:44    5          So at a college, getting people -- you know, this

6     comes up in Title IX investigations, it comes up in civil

7     rights investigations, it comes up in academic honesty

8     investigations.  It's almost impossible to get somebody who

9     doesn't know anybody.

11:47:02   10          So if the rule -- if there's a rule from this Court

11     you can't be involved if you know any facts, most colleges are

12     not going to be able to run an investigation.

13          Now, as it happens, the panel under the rules is

14     comprised of people who aren't from the College of Law.  So

11:47:17   15     all of the panelists come from colleges of the university

16     outside of the College of Law.

17          So which brings me to my last point, and then I want

18     to get back to what the hearing really should be about is

19     *Sampson vs. Murray* and its progeny.  The last point that

11:47:30   20     counsel brought up as being an alleged breach is that

21     Rosato -- or bad Hearing Committee selection.

22          The -- there is no -- there is no explicit or

23     implicit rule that the committee can't allow a subcommittee of

24     itself to make a designation.  There -- if there -- in some

11:47:54   25     cases, there are laws that say, that restrict boards or

1    committees from delegating to subcommittees or subentities.
2    None of them are even allegedly in play here.

3           So, anyway, so now I get to my main argument.  I
4    would say that everything we've addressed so far is a red
5    herring because it doesn't matter if we breached our contract.
6    We didn't.  But even if we did, there's still no irreparable
7    harm.

8           So we've got *Sampson vs. Murray*, which says special
9    rules for employment cases, it's got to be some extraordinary
10   situation that's not common to an employment setting before
11   we're going to issue a preliminary injunction.  We've got
12   *Bedrossian*, which I started to get to before we got
13   sidetracked, and I'll quote from *Bedrossian*.

14          "The Supreme Court set a high standard for obtaining
15   preliminary injunctions restraining termination of employment.
16   Although it did not foreclose relief from the genuinely
17   extraordinary situation, the type of irreparable injury
18   required must really depart from the harms common to most
19   discharged employees.  The plaintiff in *Sampson* alleged
20   humiliation, damages to reputation, and loss of income due to
21   her purportedly wrongful termination from federal employment.
22   The court held that these injuries did not rise to the level
23   of an extraordinary termination of employment situation and
24   that they were not irreparable to warrant a preliminary
25   injunction."

1        So we cite at Page 15-16 of our brief a number of

2  cases where courts routinely, where someone tries to stop

3  termination or delay disciplinary proceedings.  We cite a

4  number of cases from the Northern District of Illinois and

11:49:36    5  from other jurisdictions, but *Jones vs. Greyhound Exposition*

6  *Services*, Northern District of Illinois, denying injunctive

7  relief where a plaintiff was alleging employment

8  discrimination, reasoning that if the plaintiff succeeds at

9  trial, "he will be able to collect damages for any harm he has

11:49:54  10  sustained ... *Sampson* and its progeny teach that future

11  recovery negates the irreparability of harm that is a

12  prerequisite to any granting of injunctive relief."  Period,

13  hard stop.  That should be the end of this discussion.  And I

14  recite a number of other cases for that proposition.

11:50:17  15        Then, we talk about what about the fact that if we

16  read the transcript of what counsel said, he might lose this,

17  he might lose that.  Something might happen to him.  He might

18  get discharged.  He might blah, blah, blah, blah.

19        The fact that the damage that might happen to him is

11:50:34  20  speculative by itself forecloses injunctive relief, and at

21  Page 16 and 17 of our brief, we cite a number of cases that

22  stand for the proposition that if you haven't been fired yet,

23  if the bad thing hasn't happened yet, we can't grant an

24  injunction.

11:50:48  25        Once you're fired if we find a wrong, we can grant an

1    injunction ordering you reinstated, as one of the cases

2    they've cited says.  That's one of the pieces of relief the

3    courts have available.

4         Next, there's a litany of cases which we cite,

5    starting at Page 17 of our brief, standing for the

6    proposition, and the Court was all over this the last time we

7    were here and again today, if there's an internal process

8    where you can make your arguments, that forecloses the option

9    of injunctive relief.

10        The existence of a not complete and internal process

11   bars injunctive relief.  *Nuovo vs. Whitacre*, which is one of

12   the cases we cite, United States District Court case, and I'm

13   quoting and there's italics in the original here, denying --

14   they're denying injunctive relief where "evidence

15   unquestionably presents only an as-yet *incomplete*" -- italics

16   in the original on the word incomplete -- "process that *could*"

17   -- original italics on the word could -- "lead to *possible*"

18   italics in the word possible -- "disciplinary action against

19   the plaintiff at *some indeterminate point in the future*."

20   Again italics.  "The evidence teaches that such disciplinary

21   action would be subject to a surprisingly extended process

22   during which the plaintiff, who would remain a tenured faculty

23   member through the process, could seek review and potential

24   absolution from any adverse action taken against him."

25        If there's a process that you're part of in which you

1      might win, that's the end of your injunction, and the Court

2      was over that last time we were here, the Court was all over

3      it here today.  Even if all of my other arguments were wrong,

4      the fact that there was an internal process which could agree

11:52:30    5      with him forecloses the possibility of granting injunctive

6      relief.

7              Another thing the Court stated last time we were

8      here, and again I'm telling the Court something the Court

9      already said from the bench earlier today, if you've got

11:52:41   10      arguments that your Handbook was violated, you can raise that

11      argument -- those arguments to the committee.  They're wrong,

12      but you can raise them with the committee.

13              And in the *Karimi* case, which we cite at Page 17 of

14      our brief, which again is another you-didn't-follow-your-

11:52:55   15      handbook case where the court again refused to enter an

16      injunction, the court said, "If, as the plaintiff contends,

17      the charges against him are not warranted under the Handbook,

18      a disciplinary hearing is one of the procedures the Handbook

19      provides to make that determination."

11:53:10   20              The Court might think the contract arguments are

21      good, they might think they're bad, but you have to make them

22      to the committee first.  And in this case, there's another

23      appeal after that, make that other appeal after that, and if

24      you lose, then you can come back.

11:53:23   25              So there's no irreparable harm, plus there's an

1    internal procedure here.  Either one of those by itself
2    kiboshes --
3              THE COURT:  What if the plaintiff can show that
4    completing the internal procedure would be futile?
5              MR. RUMBAUGH:  There is no -- the Court asked an
6    apposite question:  Are you alleging bias on the part of the
7    committee?  It's not alleged -- I can't name the committee
8    members.  There's no allegation that there's someone on the
9    committee that isn't arm's length, that's already prejudged
10   the case, that's already written an article saying Smith has
11   to go.
12             If those -- if those facts were here, I wouldn't be
13   here.  I'd be agreeing.  But there's been no allegation of any
14   lack of -- any partiality or lack of impartiality on behalf of
15   the committee.  There's been no allegation of prejudging.  If
16   those facts were here, that would be something to talk about,
17   but they're not even alleged, your Honor.
18             Another piece, which is in our brief which I want to
19   cite which is important, there's a long line of federal
20   precedent standing for the proposition that you can't sit on
21   your rights and then come in and ask for an injunction.  Here
22   we're eight months since the charges and five months since
23   this case was sent to the panel.  That's too long to wait.
24   The delay by itself prejudices DePaul and renders injunctive
25   relief unavailable.

1                    Plaintiff says --

2          THE COURT:  But what if -- I think the response to

3     that in the brief was that, one, plaintiff was hoping that

4     there would be a negotiated resolution in the interim; and,

5     two, under the school's policies, it couldn't start these

6     proceedings until it got to the academic year again, and so

7     it's not really that long of a delay if you look at it as they

8     were using the break in between the academic sessions to try

9     to negotiate a settlement.

10         MR. RUMBAUGH:  There didn't need to be a break

11    between the academic sessions, and I would take the position

12    that to the extent there was one, that was engineered and not

13    necessary, but there's a delay and that, by itself, forecloses

14    injunctive relief.

15         THE COURT:  What do you mean when you say it was

16    manufactured?

17         MR. RUMBAUGH:  We think that, and we've said this in

18    our pleadings, that plaintiff is intentionally dragging this

19    out.

20         THE COURT:  But isn't it --

21         MR. RUMBAUGH:  Every time we try and meet with him,

22    it gets pushed back months and months and months.

23         THE COURT:  But isn't it true that the school wasn't

24    going to institute proceedings during the summer session or

25    could it have been -- is there a summer session that ended in

1  May or June?

2       MR. RUMBAUGH:  This could have happened earlier.  It

3  ended up taking until the session started, and it might be the

4  case, your Honor, that that was likely given academic

11:56:12  5  calendars, but it wasn't inevitable.

6       THE COURT:  And are there any concrete plans at this

7  point to schedule a hearing?

8       MR. RUMBAUGH:  My understanding is that the committee

9  has met, but there is no date and there's no rumor of a date.

11:56:28  10       THE COURT:  So what's the process for them to follow?

11  They meet, and then do they have to set a date by a certain

12  point in time?

13       MR. RUMBAUGH:  They meet and they meet and confer

14  with both sides to agree on a date.  As far as I know, the

11:56:42  15  meeting to pick a date hasn't even happened yet.

16       THE COURT:  The meeting of the -- of the panel?

17       MR. RUMBAUGH:  Yeah, the first -- my understanding,

18  and I -- I hesitate to say anything because I'm not involved

19  in this process, but my understanding is the panel had its

11:56:55  20  first meeting recently, but they didn't get to the issue of

21  addressing when the hearing would happen.

22       THE COURT:  And then you said they meet with both

23  sides.  Does that mean that they will try to speak with

24  Professor Smith and his counsel to see if he will agree on a

11:57:08  25  hearing date?

1          MR. RUMBAUGH:  Yeah, I think -- yes.  Like a court

2     would schedule a summary judgment argument.  Are you available

3     on November 5th?  So the parties have input, my understanding

4     is, into when the hearing would happen.

11:57:21   5          So in conclusion, your Honor, and I won't use all of

6     my time.  I don't need to reserve, and I -- *Sampson* is

7     controlling.  *Sampson* and *Bedrossian* are controlling.

8     There's -- and there's dozens of cases, including from within

9     this circuit, simply saying no regardless of the underlying

11:57:42  10     merits to stopping an -- stopping an internal process and to

11     stopping termination of employment absent situations that

12     aren't even alleged to have occurred.

13          That's even assuming everyone agreed that the

14     underlying contract arguments are accurate, that they're

11:57:59  15     meritorious.  They're not, and as your Honor said in *Vignola*,

16     there shouldn't be an injunction unless the complainant

17     carries its burden of persuasion by a clear showing.

18          There's no clear showing on the contract pieces, but

19     even if there was, there's no irreparable harm, as the Seventh

11:58:19  20     Circuit and the U.S. Supreme Court have reckoned it over and

21     over and over again in the employment context, and there's an

22     internal process that's not complete.

23          We submit that the correct response from this Court

24     is take no position on whether you're right or wrong on your

11:58:33  25     underlying arguments regarding the process, but you've still

1    got an internal process to go.  You need to follow that

2    internal process.  That's one reason for denying the claim for

3    injunctive relief.

4            And, two, the damages that you've alleged, you're

5    saying they're irreparable, but in a breach of contract

6    context, in a civil rights context where people have suffered

7    or allegedly suffered serious harm, the answer is still that's

8    reparable through injunctive relief or money or other

9    equitable relief at the end of a legal process, not at the

10   preliminary injunction stage.

11           Thank you, your Honor.

12           THE COURT:  Thank you, counsel.

13           Okay.  Mr. Bramwell, I'll give you a little bit of

14   time for rebuttal, since I did ask you a fair amount of

15   questions when you were up there.

16           MR. BRAMWELL:  Well, Judge, I hope I'll be brief.

17           First of all, my colleague said if they cite cases

18   where internal processes have been enjoined, they win.

19           Judge, I invite you to take a look at Page 10 of our

20   reply brief, where we cited *Nokes v. Miami University* and we

21   cited *Doe v. University of Cincinnati*.  These are cases out of

22   the Southern District of Ohio involving disciplinary

23   proceedings, albeit regarding students, but citing

24   disciplinary proceedings that were enjoined at the preliminary

25   stages.

1        So that's point 1.  I've only got two other points.

2        Point No. 2.  In *Sampson* and in *Bedrossian,* the

3    employee was already gone.  In this case, Terry Smith is still

4    here.  This is the extraordinary case because we're not

5    dealing with -- because we're asking you, Judge, to preserve

6    the status quo, not change the status quo, which is *Sampson*

7    and *Bedrossian*, but to preserve the status quo, and the status

8    quo is that Terry Smith is a tenured professor of law at

9    DePaul University, and that's the status quo.

10        Third, we highlight civility and collegiality

11    problems at the College of Law as supposedly the reason that

12    we need to move this process along so quickly.

13        Judge -- and you had civility and collegiality

14    problems in outside reports, those outside reports we

15    discussed at sidebar.  Those outside reports say that there

16    are civility and collegiality problems at the DePaul College

17    of Law because Professor Smith files EEOC complaints and

18    people don't like that and, therefore, they don't want to work

19    with him.

20        Judge, if their position, and I cannot overemphasize

21    this, if their position is these two reports say that there's

22    a collegiality problem and the collegiality problem is EEOC

23    complaints and that's a collegiality problem --

24        THE COURT:  Well, again, I mean, I did look at the

25    materials.  They refer to him using very profane language

12:00:01

12:00:21

12:00:44

12:00:59

12:01:15

1    towards colleagues, driving people crying in tears out of

2    rooms.  I mean, that doesn't seem to be related to the EEOC

3    complaints.  It seems that you are drawing your argument very

4    narrowly to focus on what would be most clearly activity that

12:01:36    5    should be protected, you know, at all costs and perhaps not

6    acknowledging that the actual allegations against Professor

7    Smith are broader than that, true or not.

8         MR. BRAMWELL:  There are some allegations that are

9    broader than that, but in these two reports that Mr. Rumbaugh

12:01:56    10    cited, that's what we're talking about, EEOC complaints.

11         Certainly Dean Rosato's report charges that people

12    are upset.  Professor Smith denies using profane language.  He

13    has constantly denied that.  He denies that in his rebuttal.

14    He denied that in other documents that were attached to the

12:02:15    15    reply, but, you know --

16         THE COURT:  And, again, that may be true.  I have no

17    view on --

18         MR. BRAMWELL:  On the truth.

19         THE COURT:  -- on those factual disputes, but it does

12:02:28    20    appear the allegations were made, regardless of whether they

21    were accurate or mistaken or intentionally misleading or

22    whatever they might have been.

23         MR. BRAMWELL:  I just wanted to be sure that all of

24    these, you know, quote/unquote "outside" investigations that

12:02:43    25    have been referenced for years and years and years, the

1    investigations, you know, the two other investigations, again,

2    that we spoke about at sidebar, that wasn't talking about

3    swearing or driving people out of the room crying.  That was

4    talking about EEOC investigations or EEOC complaints that

12:03:05    5    Professor Smith made.

6        The complaints about driving people out of the room

7    and crying done by Powers, done by Dean Rosato.  Dean Rosato

8    didn't speak to Terry Smith to get his side of the story at

9    all before reaching those conclusions.  Professor Powers did

12:03:22    10    not speak to Terry Smith either because DePaul University

11    refused to allow Professor Smith to have an attorney, me, sit

12    quietly in the room during those interviews, citing no

13    specific policy that prohibited it.

14        So I would just say that these charges of civility

12:03:43    15    and collegiality problems are -- are -- it's being stretched

16    significantly.

17        Unless you have additional questions, Judge.

18        THE COURT:  Actually, give me a moment.

19    (Pause.)

12:04:22    20        THE COURT:  Okay.  I do not believe I have any

21    further questions, at least not about the substance of today's

22    proceedings.  So thank you, Mr. Bramwell.

23        Let's talk about procedure.  There was a suggestion a

24    few moments ago or maybe towards the beginning or end of

12:04:43    25    Mr. Bramwell's presentation that the parties might do

1    post-hearing briefing.

2         Is that a request for post-hearing briefing?

3         MR. BRAMWELL:  If you -- if post-hearing briefing on

4    any topic that was raised, particularly the topic with respect

12:04:58   5    to what a good investigation looks like would be helpful, I'm

6    happy to do it.  If it would not be helpful, I've got lots of

7    other briefs I have to write.

8         THE COURT:  I feel like I have a lot of paper.

9         MR. RUMBAUGH:  We're not asking for any additional

12:05:13  10    briefing, your Honor.

11         THE COURT:  Okay.

12         MR. BRAMWELL:  Whatever would be helpful to the Court

13    is my goal.

14         THE COURT:  Okay.  At this point, I do feel like I

12:05:18  15    have quite a bit of briefing.  We had full briefing before the

16    hearing with a lot of exhibits in addition to the oral

17    arguments.  So I suppose at this point, I don't feel that I

18    need any further briefing.  I'd like to look at some of the

19    materials that I have.

12:05:32  20         Now, timingwise in terms of when I need to have a

21    ruling for the parties, the issue here I think is at what

22    point these disciplinary proceedings are likely to be moving

23    forward, and from what I can tell, no date has yet been set?

24         MR. RUMBAUGH:  If I had to guess, I would say

12:05:54  25    November, but it may be later.  But I would not guess that it

1  would be before November.

2      MR. BRAMWELL:  We have a -- actually a joint

3  memorandum due on Tuesday to the Hearing Committee.

4      MR. RUMBAUGH:  You got an extension.

12:06:11   5      MR. BRAMWELL:  Yeah, from Monday to Tuesday.

6      MR. RUMBAUGH:  Oh.

7      MR. BRAMWELL:  I can show you the email if you'd

8  like.

9      MR. RUMBAUGH:  No, no.

12:06:15   10      THE COURT:  So at what point in the process is that?

11  Is that something that happens before the parties start

12  conferring on an actual hearing date?

13      MR. BRAMWELL:  So this is a hearing or, sorry, a

14  memorandum to see if we can agree on procedures.  So we have a

12:06:33   15  little bit of time, but we're also going to be starting to

16  prepare our presentations, aligning witnesses, and all of that

17  other jazz that, of course, does come with what is essentially

18  a trial.

19      THE COURT:  Okay.  And so your joint memo is due on

12:06:49   20  September 18th.

21      MR. BRAMWELL:  That's right.

22      THE COURT:  Okay.  And that's -- have you been able

23  to agree on procedures?

24      MR. BRAMWELL:  No.

12:06:54   25      THE COURT:  Okay.  I'm shocked.

1    The record can reflect that there was a hint of

2    sarcasm within the bounds of hopefully --

3    MR. RUMBAUGH:  Sarcasm heard and shared.

4    MR. BRAMWELL:  And we were all smiling.

5    THE COURT:  Yes, shared in the room by everyone with

6    that, and not surprised you've had some difficulty, especially

7    since this entire case is largely about procedure.

8    So if the parties don't agree on a procedure, then

9    what's the next step?  The --

10   MR. BRAMWELL:  The Hearing Committee will likely

11   unilaterally make a decision, and that will be that.

12   THE COURT:  And will they issue some sort of a paper

13   or some sort of document that says here's the procedure?

14   MR. RUMBAUGH:  That's what we'd expect, but it's up

15   to them, and they don't answer to me.

16   THE COURT:  Okay.

17   MR. BRAMWELL:  They do answer to your clients that

18   are in the room.

19   MR. RUMBAUGH:  I don't think they do.

20   THE COURT:  Okay.  With respect to the case overall,

21   have the parties been able to proceed with discovery while

22   you've been preparing for this hearing?  Have you made

23   progress since the last time I saw you?

24   MR. BRAMWELL:  There has been some limited progress.

25   We are happy to have certain documents.  Here's what's mostly

1    coming down the pipe, Judge.

2         As you know, you issued a confidentiality order,

3    allowing -- you know, the model confidentiality order.

4         We got back from defendant, and the reason I'm

5    letting you know is because there will most likely be a motion

6    on this very shortly.  We got back from the defendant 1300,

7    approximately, documents.  A lot of these are emails and other

8    pieces of correspondence.  Some of these pieces of

9    correspondence are between nonparty faculty members.

10        A good portion of this correspondence, email

11   correspondence and non-email correspondence, are -- is

12   correspondence that Terry Smith either authored or that he

13   received, and they've all been designated confidential.  This

14   represents a major problem for us in the sense that these are

15   documents that Terry Smith would have had the opportunity to

16   discuss with people, to share with people, they're his own

17   documents that have now been thrown into the box of a

18   confidentiality order.

19        Mr. Rumbaugh and I met and conferred on this on

20   Monday, and the conversation, of course, was passionate but

21   civil, but, you know, this is going to be a major problem for

22   us.  Essentially, they've instituted a gag order on us talking

23   about our own documents, documents that we have received,

24   documents that we have sent that we would otherwise be able to

25   discuss but for this designation.  So that's what's coming

1    down the pipe.

2         THE COURT:  So it's a -- you're going to have a

3    motion to challenge the confidentiality designation?

4         MR. BRAMWELL:  Right, for all documents that

5    Professor Smith sent or received just generally.

6         MR. RUMBAUGH:  I can address this if you want, your

7    Honor, but I'd prefer to just wait until a brief is filed.  We

8    disagree on the factual predicate and the law, but I don't

9    need to address it now.

10        THE COURT:  What I'm wondering, since the parties

11   have met and conferred and you know what the issue is, I'm

12   wondering whether it makes sense to have a traditional motion

13   schedule on this or whether it might make sense to have a

14   joint submission from the parties, where each side just lays

15   out their respective position on how these documents should be

16   treated in a single document with -- supported by case law,

17   and that way there can be one submission.

18        MR. RUMBAUGH:  I'm amenable to that, your Honor.

19        MR. BRAMWELL:  Whatever would make the Court's job

20   easier.  I'm just having a hard time seeing how a joint

21   submission would come together, as opposed --

22        THE COURT:  A couple of my colleagues actually

23   require it in all of their discovery disputes for people to

24   file a single --

25        MR. BRAMWELL:  Really.

12:09:54

12:10:17

12:10:30

12:10:52

12:11:06

1    MR. RUMBAUGH:  We file joint Rule 26 reports weekly.

2  We'll be able to do this, counsel.

3    MR. BRAMWELL:  Then I will learn again from you.

4    MR. RUMBAUGH:  Hah.  Sarcasm noted.

12:11:18    5    MR. BRAMWELL:  No, there was no sarcasm.

6    THE COURT:  And maybe it's not feasible, but I just

7  wonder in this circumstance because as I understand it, you've

8  got a kind of discrete category of documents.

9    MR. BRAMWELL:  Right.

12:11:32   10    THE COURT:  And the positions are directly opposite,

11  either they should be confidential or they are properly

12  designated confidential.

13    MR. RUMBAUGH:  There's another side to this coin

14  which counsel didn't bring up.  We expect counsel's going to

12:11:47   15  be filing a motion to redesignate certain documents because

16  they had the ability to -- I'll paraphrase, that they had the

17  ability to disclose them before their designation, and now

18  they're constrained, to which our response is that's true in

19  every case there's a protective order.

12:12:04   20    However, there's another set of documents that we're

21  going to be moving on the other way.  The Court -- we had a

22  hearing on the entry of a confidentiality order.  Plaintiff

23  opposed the entry of a confidentiality order.  The Court heard

24  oral arguments, granted our motion and said it was going to

12:12:21   25  enter a confidentiality order, but we didn't get it until

1    shortly after our last court appearance.

2        During that interim period, counsel, and I'll tell

3    you how we take it and counsel is going to say no, that's not

4    what we intended, but counsel, in their first tranche of

5    exhibits attached their principal brief for this hearing,

6    counsel dumped 1300-and-some pages of exhibits during this

7    interim period between when the Court granted the motion to

8    enter a confidentiality order and when we got the order and we

9    could start designating stuff.

10       It's our position that that was done intentionally to

11   get stuff into the public domain so that we couldn't designate

12   it, but whether that was the intention or not, that was the

13   effect, and so we're going to be filing a motion to claw back

14   documents that we would have designated as confidential had

15   the Court entered its order at the time that it granted our

16   motion and said it was going to enter the order.

17       And the Court -- we -- the Court will be shocked to

18   know that we've met and conferred on this, and we can't agree;

19   but we intend to be briefing that, which is the other side of

20   the coin of counsel's argument that we should be redesignating

21   things one way.  We're going to want to be redesignating

22   things the other way for similar and opposite reasons.

23       THE COURT:  Okay.  And those things, things that are

24   already in the public record are obviously things that I have

25   access to because they've been filed.  What I think I would

need in order to address the issue of the emails is some subset of exemplar emails that can be included.

MR. BRAMWELL: Some of these documents, Judge, they're on my own letterhead. They're letters that I sent to counsel for DePaul. I am precluded right now from using my own work product.

MR. RUMBAUGH: Not in this case. The order doesn't restrict -- and here's the nub, and I want to -- when this case was first -- the first time we were in front of your Honor and we were -- maybe it was in the first appearance, but we were talking about the confidentiality order, the Court speculated that this court might have been filed prematurely to get the Powers Report. I can't remember exactly what the Court said, but the court speculated on that possibility, because it's been driving plaintiff nuts that he doesn't have the Powers Report.

When we produced it once we got the ability to designate it as confidential because it includes information regarding lots of other people, and it's our position that the lawsuit itself is premature, it shouldn't be filed, there's been no adverse action or material adverse action to make -- to support the underlying claim, that's the basis of our motion to dismiss, the order doesn't limit counsel -- counsel said I can't use this document. Well, in this case, they can. They're absolutely unrestricted.

1    What they're limited in is using it in the media or
2  sending it to other people because they're involving other
3  people's confidential information, and I would submit, I'm
4  preempting my argument, that the fact that Attorney Bramwell
5  drafted a document or Mr. Smith drafted a document or
6  possessed a document lawfully before the entry of the order
7  doesn't mean it's not -- doesn't fit one of the pigeonholes
8  that would allow its designation as confidential.  It might or
9  might not, and I haven't seen the exemplars that Mr. Bramwell
10  will point out.  I'll point out others.

11    My expectation is his argument will be better for
12  some and worse for others and same for me, but you could have
13  a document that I authored that mentions four people's
14  confidential information, one of whom isn't a party to this
15  case and, therefore, it would be appropriate to designate that
16  document as confidential, notwithstanding the fact that I
17  authored it, that wouldn't restrict my ability to use it in
18  this case.  It would restrict my ability to give it to the
19  media.

20    That's the only hamstring on counsel, and that's the
21  only thing that rankles.

22    THE COURT:  Okay.  I would like the parties to put
23  together a single submission that addresses this issue of the
24  over/under-designation of documents pursuant to the
25  confidentiality order because I think these discovery issues

12:15:40
12:15:57
12:16:12
12:16:27
12:16:47

1    fall under the same general umbrella of whether or not they
2    should be designated.

3         Your single submission should hopefully have an
4    agreed-upon explanation of what the background is here, what
5    types of documents are at issue, when they were produced or
6    not produced, when they were filed publicly, et cetera.

7         I would hope the parties could more or less agree on
8    a timeline of these things that might apply, not necessarily
9    what it means.  So, for example, the fact that something was
10   publicly filed before the confidentiality order was entered is
11   an objective fact.  What conclusions can be drawn from that,
12   that's something else, and that will go in a different section
13   of this filing.

14        Each party will have an opportunity to put forth your
15   position in this filing as to which of these documents should
16   be confidential or not confidential and why.

17        So by saying that this is a single filing, I am not
18   suggesting you have to agree on the outcome.  The idea is just
19   to have it in one place rather than having two sets of briefs
20   going back and forth with responses and replies so that there
21   are six documents.  I don't see any reason here why, while on
22   this specific issue, you can't lay forth your respective
23   positions in the same document.

24        It can be up to 30 pages.  Hopefully, it won't be
25   that long.  I'm giving you that much for the single document

1    because if you were doing briefing back and forth, you'd

2    technically have up to 15 pages per brief, and so you could be

3    in the realm of, you know, 45 to 60 pages.  So hopefully this

4    will streamline things significantly.

12:18:45    5    I will need exemplar documents of things such as the

6    emails.  If the question is with respect to things that are in

7    the public docket, you may attach them if you think it's

8    useful, or you can just reference the docket entries where I

9    can find them.

12:19:04    10    For the examples, since you're contesting whether or

11    not they should be confidential, depending on the volume of

12    them, you are either granted leave to file them under seal or

13    you can just deliver them to chambers for my *in camera* review,

14    which might be easier and allow you to put together a larger

12:19:28    15    package that might even be all inclusive of all the documents.

16    I don't know how many pages, if it's dozens or hundreds.  If

17    it's dozens, then perhaps just submitting the entire group for

18    my *in camera* review might be easier.

19    MR. BRAMWELL:  Hard copy or electronic?

12:19:46    20    THE COURT:  For *in camera* review?

21    MR. BRAMWELL:  Right.

22    THE COURT:  Either is fine.

23    MR. BRAMWELL:  Okay.

24    THE COURT:  It depends on the volume.  If we are

12:19:54    25    talking hundreds and you've got them in electronic, that's

1      fine.  We'll return the device, whether it's a thumb drive or

2      a disk, back to whichever party claims it afterwards.

3             MR. BRAMWELL:  Okay.

4             THE COURT:  We work in hard copy, too, sometimes.

5             Is this issue ripe at this point?  Should I set a

6      date for this joint submission to be filed, or do the

7      parties --

8             MR. BRAMWELL:  It is ripe, and it's also concerning

9      to us because if we have to defend an internal process and now

10     our hands have been tied because we can't use the documents

11     and the information contained in those documents other than in

12     this case, it's really causing problems for us.

13            If they would agree that we can at least use these

14     documents in the internal process, that would be -- you know,

15     our own documents in the internal process, that would

16     eliminate a lot of the problem.

17            MR. RUMBAUGH:  That is something that we've not

18     discussed, and I'd be happy to discuss that with you.  I'm not

19     going to blanket say yes, but I think we'll be able to agree

20     as to some.

21            That's not an issue that's come up.  The only issue

22     that's come up is releasing them to the *New York Times*.

23            MR. BRAMWELL:  We have no desire to do that.  We have

24     never had a desire to do that.

25            MR. RUMBAUGH:  That was in the whole of our

1   discussion.

2   MR. BRAMWELL:  No, it hasn't been.

3   THE COURT:  Okay.  Well, you can have this argument

4   outside afterwards.  However, do have a discussion on that

5   particular point, and if you do need to go ahead and file

6   we'll call it like a motion for, I don't know, clarification

7   of confidential status, whatever you want to call it, make

8   sure that it clearly indicates whether you've reached

9   agreement on the use of the documents in the internal process.

10   That seems like a discrete issue that's different

11   from being able to share the documents outside of the internal

12   process with the media, with other third parties, with faculty

13   at other schools.

14   MR. RUMBAUGH:  My expectation is that my response

15   isn't going to be blanket.  I'll have to confer with my

16   client.  I don't know what my response is, but if you show me

17   a particular document, I can tell you what I think.

18   THE COURT:  Well, and I would also think that part of

19   the issue may be that if there are third parties who are going

20   to be brought in front of the panel to provide testimony, if

21   that's what happens, whether or not they can be shown

22   documents, as opposed to documents being used by people who

23   already have access to them as part of the process, try to

24   agree on that.

25   You can obviously file your submission sooner if you

12:21:29

12:21:47

12:22:01

12:22:15

12:22:41

1  like, but I would give you three weeks, 21 days, until
2  October 5th.
3        And I think the parties have demonstrated to me that
4  you've met your meet-and-confer requirements, so you don't
5  have to use any of your 30 pages to lay out your efforts to
6  meet and confer, though obviously if there are compromises
7  that have been reached or things taken off the table, that's
8  fine to highlight that.
9        In terms of a decision on this hearing, I suspect I'm
10  going to want to put something in writing.  It sounds like
11  there's a little bit of a window here.  Do we still have the
12  agreement in place that defense counsel --
13        MR. RUMBAUGH:  We'll notify the Court when there's a
14  hearing date --
15        THE COURT:  Okay.
16        MR. RUMBAUGH:  -- of what the hearing date is.
17        THE COURT:  I think what I would like to do then is
18  set a status date.  We may have a written ruling in advance of
19  the date probably, but if not, a date by which you can have an
20  oral ruling.  Columbus Day.
21        Okay.  October 12th?
22        MR. BRAMWELL:  Perfect.
23        THE COURT:  With the parties keeping in place the
24  agreement that the Court and then obviously the plaintiff and
25  plaintiff's counsel will be notified immediately of the

1    setting of a hearing date, and we'll expedite things here if

2    we need to, but let's say October 12th at 10:00 a.m.

3            So for counsel, are you able to be here then?

4            MR. RUMBAUGH:  Yes, your Honor.

12:24:36  5            THE COURT:  And if I've received a filing on the

6    confidentiality document, we may be able to address that as

7    well and check in on the progress of the case overall.

8            MR. RUMBAUGH:  So October 10 --

9            THE COURT:  I'm sorry.

12:24:53  10            MR. RUMBAUGH:  October 12, 10:00 a.m.

11            THE COURT:  Correct.

12            MR. RUMBAUGH:  All right.  And the Court will be

13    issuing an order to that effect?

14            THE COURT:  Yes.

12:25:00  15            MR. RUMBAUGH:  Thank you, your Honor.

16            THE COURT:  Thank you.  I'm taking this matter under

17    advisement as fully briefed and argued.

18            Thank you for answering my questions today.  I

19    appreciate it.

12:25:08  20            MR. RUMBAUGH:  Thank you, your Honor.

21            MR. BRAMWELL:  Thank you, Judge.

22        (Which were all the proceedings heard.)

CERTIFICATE

23    I certify that the foregoing is a correct transcript from
the record of proceedings in the above-entitled matter.

24    /s/Kathleen M. Fennell              September 19, 2018
_____        _____

25    Kathleen M. Fennell                      Date
Official Court Reporter